JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* BRUCE ELIEFF, *et al.*,<br><br>Debtors. | Case No. SA CV 21-1720-DMG<br><br>**ORDER AFFIRMING BANKRUPTCY COURT ORDER**<br><br>Bankruptcy No. 8:19-bk-13858-ES |

This matter is before the Court pursuant to 28 U.S.C. § 158(c)(1), on appeal from the United States Bankruptcy Court of the Central District of California, Santa Ana Division's Order approving the sale of certain real property (the "Shorecliff Property") located in Corona del Mar, California, following an auction, as part of Debtor Bruce Elieff's Chapter 7 bankruptcy proceedings. *See* Sale Order, *In re Bruce Elieff*, Case No. BK SD 8:19-13858-ES (Oct. 13, 2021) [Doc. # 1219].

Todd Kurtin challenges the Sale Order on the basis that the Bankruptcy Court erred by (1) failing to ensure that the sale of the Shorecliff Property at auction garnered optimal value, in light of the Property's allegedly materially "overstated" listing price, and approving a sale for less than fair market value and thereby failing to adequately protect Kurtin's interest in that property as a person with a claim and liens against the Debtor; (2)

authorizing the sale "free and clear" of Kurtin's liens and claim, when the latter were earlier held not to be avoided; and (3) finding that the buyer was a good faith purchaser under 11 U.S.C. § 363(m) without disclosure of the buyer's equity holders. [Doc. # 11 at 5-6.[1]]

Kurtin fails to show that the Bankruptcy Court abused its discretion. Therefore, the Court **AFFIRMS** the Sale Order and **DISMISSES** the present appeal.

# I.

# BACKGROUND

Beginning in the early 1990s, the Debtor and Kurtin engaged in a series of real estate investment and development projects as equal partners, owning the projects through various business entities. *See In re Elieff*, 637 B.R. 612, 617 (B.A.P. 9th Cir. 2022).[2] In 2003, the relationship between the two began to deteriorate, and Kurtin sued the Debtor and his separately owned development entities. *Id.* Kurtin eventually obtained a settlement agreement, pursuant to which he divested himself of his interests or rights in the joint entities and was to receive a payment from the Debtor or the joint entities. *Id.* at 617–18. The settlement agreement failed to be implemented and ultimately, in February 2020, Kurtin obtained a judgment against the Debtor for approximately $34 million. *Id.* at 619. Kurtin recorded abstracts of judgment against the Debtor and two of his separate entities. *Id.*

On October 2, 2019, the Debtor and two of his separate entities filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. *Id.* Three additional Debtor-related entities also filed for bankruptcy in early 2020. *Id.* The Bankruptcy Court consolidated these proceedings and appointed Howard Ehrenberg as Trustee. *Id.* The matter was later converted to a Chapter 7 proceeding. *Id.* at 620.

---

[1] Citations to the record are to the CM/ECF pagination.

[2] The Court grants Kurtin's request to take judicial notice of the published opinion of the Ninth Circuit's Bankruptcy Appellate Panel in this matter. [Doc. # 18.] The Court relies on that opinion for certain pertinent background facts.

On October 19, 2019, within weeks of when the Debtor filed for bankruptcy, the Debtor brought a separate, adversary proceeding in the Bankruptcy Court against Kurtin, seeking, among other relief, mandatory subordination of Kurtin's $34 million claim (the "Kurtin Claim") and all related lien rights under 11 U.S.C. § 510. *Id.* at 619; *see also* Second Amended Complaint ¶¶ 68–71, *Elieff, et al., v. Kurtin* ("the Subordination Litigation"), SD AP 19-01205-SC (Bankr. C.D. Cal. Dec. 6, 2019) [Doc. # 11]. The Trustee later took over as the plaintiff in the Subordination Litigation. *In re Elieff*, 637 B.R. at 620.

In January 2021, the Bankruptcy Court granted summary judgment in the Trustee's favor on the subordination claims, finding that 11 U.S.C. § 510(b) (requiring mandatory subordination) applied to the Kurtin Claim. *Id.* After this ruling, both parties requested clarification of whether the subordination was limited to just Kurtin's "claim" or included subordination of his judgment liens. *Id.* The Court held another hearing and entered an order stating that Kurtin's liens were subsumed within the term "claim" as used in § 510(b) and found that the judgment liens were subordinated for the same reasons and to the same extent as his claim. *Id.* at 620–21. On April 5, 2021, the Bankruptcy Court entered a final judgment on the subordination claims, and Kurtin appealed, challenging the Bankruptcy Court's determination that section 510(b) mandatory subordination applied to his claim and liens. *See id.* at 621.

Meanwhile, on July 22, 2021, the Trustee filed a motion for the Bankruptcy Court in the Chapter 7 proceedings to authorize the sale of the Shorecliff Property free and clear of liens, claims, and encumbrances for $18,888,888 to NB Property One, LLC (the "stalking horse bidder"[3]), subject to overbid at auction. Appellate Record ("AR") at 85 [Doc. # 12]. The Trustee also filed a supplement to this motion on August 12, 2021,

---

[3] "A 'stalking horse' bid is the first bid from a potential buyer on a bankrupt debtor's assets. The debtor solicits this bid to set the floor for the later competing bids of other potential purchasers, thereby preventing lowball offers." *Qadan v. Fla. Prop. Grp. Assocs., Inc.*, 591 B.R. 796, 801 (M.D. Fla. 2018) (internal quotation marks and citation omitted).

including addressing the treatment of Kurtin's liens and seeking approval of the sale free and clear of these liens. *Id.* at 194–99; *see also id.* at 208 (Kurtin's objection), 898 (Trustee's reply).

On September 2, 2021, the Bankruptcy Court held a hearing on the sale motion. *See id.* at 34. Among other things, the Bankruptcy Court addressed arguments that the stalking horse bid undervalued the Property, concluding—

> at the end of the day, assuming that the property had been properly marketed, the value will be what a willing buyer is going to pay for that property. So I'm not inclined to give a lot of weight to an appraisal that was attached [by Kurtin, assessing a $25 million value for the Property], and I see absolutely no reason for an evidentiary hearing.

AR at 42–43.

The stalking horse bidder and two overbidders (*see id.* at 38) bid on the Shorecliff Property, with the stalking horse bidder ultimately submitting the highest bid, for $20.6 million. AR at 53. Following the auction, the Bankruptcy Court conducted a colloquy with the stalking horse bidder's manager and found that the buyer was in good faith. *See* AR at 59–62; *see also* AR 65.

On October 12, 2021, the Bankruptcy Court entered the Sale Order, authorizing the sale of the Shorecliff Property to the stalking horse bidder "free and clear of all liens, claims, encumbrances, and interests" (including Kurtin's) under 11 U.S.C. § 363(f). AR at 12. The Court further ordered that the "net sales proceeds shall be subject to the liens, claims, encumbrances, and interests of . . . Kurtin . . . with the same force, effect, and priority as such liens, claims, encumbrances, and interests existed and attached against, to, or in the Shorecliff Property" before the Sale Order and "subject . . . to any further orders of [the Bankruptcy Court] or appellate court regarding the force, effect, and priority of any such liens, claims, encumbrances, and interests[.]" AR at 13. And the Court found that the stalking horse bidder was a qualified bidder and "good faith purchaser" pursuant to 11 U.S.C. § 363(m). AR at 14.

On October 15, 2021, Kurtin appealed the Sale Order in this Court. [Doc. # 1.]

## II.
## DISCUSSION

### A. Standard of Review

This Court reviews an order authorizing the sale of property of a bankruptcy estate under 11 U.S.C. § 363 for an abuse of discretion. *In re Lahijani*, 325 B.R. 282, 287 (B.A.P. 9th Cir. 2005).

A bankruptcy court abuses its discretion if it applies the incorrect legal standard or if the factual findings supporting the legal analysis are clearly erroneous. *See In re Veal*, 450 B.R. 897, 915 (B.A.P. 9th Cir. 2011). The Court reviews *de novo* whether a bankruptcy court applied the correct legal standard. *See United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009). The Court reviews a bankruptcy court's factual findings for clear error. *Id.* Findings are clearly erroneous if they are "illogical, implausible, or without support in inferences that may be drawn from the record." *Id.* at 1263.

A reviewing court may affirm a bankruptcy court's order on any basis that the record supports. *In re E. Airport Dev., LLC*, 443 B.R. 823, 828 (B.A.P. 9th Cir. 2011).

### B. Auction Sale Price

Kurtin first argues that the Bankruptcy Court abused its discretion when it approved the Shorecliff Property sale price: $20.6 million. Opening Brief ("OB") at 9 [Doc. # 11]. Kurtin asserts that the fair market value of the Shorecliff Property was in fact $25.5 million and that it was error to approve a sale for less than this amount. *Id.*

When a sale of estate property is not in the ordinary course of an estate's business, a bankruptcy trustee may sell the property subject to court approval after notice and a hearing. *See* 11 U.S.C. § 363(b)(1).

The bankruptcy court must assure that the sale realizes the "optimal value" of the estate under the circumstances. *In re Lahijani*, 325 B.R. at 288. A bankruptcy court may defer to the trustee's judgment but in the face of creditor opposition, the court must take care in approving the sale. *See id.* "[T]he court must not only articulate a sufficient

business reason for the sale, it must find it is in the best interest of the estate, *i.e.* it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length' transaction." *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

Here, before the auction sale, the Trustee marketed the Shorecliff Property first at a price of over $39 million, then reduced the Property's price to $34 million and subsequently, to $29 million. Appellate Record ("AR") at 41–42 [Doc. # 12]. The Trustee received no offers over the course of nearly a year, notwithstanding these reductions in price. *Id.*

Before the auction, the Trustee received bids of $18,888,888 (the stalking horse bid) and two overbids, for $19,388,000 and $19,400,000. *See* AR at 38, 50. The Trustee, after learning that one overbidder did not include a buyer's broker's commission attendant to the bid, persuaded the other two bidders to waive the right to seek a buyer's broker's commission. *Id.* at 39, 51. According to the Trustee, the overbids therefore represented a million dollars more than the original stalking horse bid. *Id.* at 39. At the auction, the Property ultimately sold to the stalking horse bidder for $20,600,000. *Id.* at 53.

At the hearing preceding the auction, the Bankruptcy Court stated, "I don't think that an appraisal is determinative of fair market value, since at the end of the day, assuming that the property has been properly marketed, the value will be what a willing buyer is going to pay for that property." AR at 42–43. The Bankruptcy Court further addressed the argument that the Trustee should have reduced the listing price to reflect the amount of the overbid but "was not really persuaded that that was an important issue." *Id.* at 44. The Court subsequently found in the Sale Order that the proposed sale was in the estate's best interest. *Id.* at 10.

The crux of Kurtin's argument on this point is that the sale price was not an accurate proxy for fair market value because the auction process was inherently flawed by the use of an inflated listing price. Kurtin asserts that the Trustee should have reduced the listing

-6-

price to reflect the initial stalking horse bid.  *See* Reply at 6.  Although Kurtin disagrees with the Bankruptcy Court's finding that the sale price approximated fair market value, mere disagreement with that court's findings is not enough to show that those findings are clearly erroneous.  *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).  This was not a circumstance in which there was only one bidder.  "[W]hen there is competition by an appropriate number of bidders," "[t]he price achieved by an auction is ordinarily assumed to approximate market value."  *In re Lahijani*, 325 B.R. at 289.

Kurtin's argument that higher bids could have been obtained by lowering the sale price is speculative—it could just as easily be said that lowering the sale price further after receiving a $19 million bid would have undermined the perceived value of the property and discouraged other prospective overbidders, the Trustee having already twice lowered the property's market value.   By Kurtin's own admission, the Property failed to sell at the listed prices notwithstanding an "exceptionally strong" real estate market—supporting the Trustee's exercise of sound business judgment in requesting approval of the sale for a lesser amount.  *See* AR at 211.

In addition, the Trustee responded to Kurtin's objections on this point by providing multiple reasons why, in the exercise of the Trustee's best judgment, the stalking horse bid represented fair market value for the Property.  The Trustee explained that "[f]ew people are able to acquire $20,000,000 properties," the Property had an "outdated architectural design," and it included an unpermitted seaside deck.  AR at 902.  This further supports the Bankruptcy Court's finding that the auction sale price of $20.6 million represented fair market value for the Property.[4]  Kurtin fails to show that the Bankruptcy Court clearly erred

---

[4] Separately, to the extent that Kurtin argues that the appropriate fair market value for the Property was the $25.5 million appraisal amount, the Ninth Circuit has noted with approval other circuits' holdings that "a purchaser who pays at least 75 percent of the appraisal value of a property has purchased for value."  *In re Zuercher Tr. of 1999*, No. BAP NC-13-1299, 2014 WL 7191348, at *11 (B.A.P. 9th Cir. Dec. 17, 2014) (approving of a sale for more than 80% of appraised value).  Here, the winning bid represented more than 80% of the appraised value, further supporting the Bankruptcy Court's decision to approve the sale.

when finding that the Sale Price represented market value for the Property under the circumstances.

## C. Adequate Protection

Kurtin relatedly asserts that he was denied adequate protection for his lien interests under 11 U.S.C. § 363(e) by the sale of the Property for less than fair market value. Kurtin asserts that the Trustee should have abandoned—not sold—the Property. *See* OB at 14–15.

"[O]n request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

Although the Bankruptcy Court authorized the Shorecliff Property's sale free and clear of Kurtin's liens, the Sale Order provided for the net sales proceeds to be subject to Kurtin's "liens, claims, encumbrances, and interests . . . with the same force, effect, and priority as such liens, claims, encumbrances, and interests existed and attached against, to, or in the Shorecliff Property[.]" AR 13. Further, the Order required the Trustee to segregate the net sales proceeds for the benefit of Kurtin and other such claimants. AR 13.

Kurtin argues that this procedure failed to adequately protect his lien interest because instead of an interest in a property worth $25.5 million, he has only an interest in proceeds from the sale for $20.6 million. But this argument assumes that the Shorecliff Property's fair market value was indeed the appraised value of $25.5 million (*see* Reply at 9–10 [Doc. # 17])—an argument that the Bankruptcy Court rejected when it explained that the price obtained at a competitive auction represented market value. *See* AR 42–43. Kurtin has not shown that the Court's finding was clearly erroneous, as explained in detail above. Accordingly, he also fails to show that the attachment of his lien to the proceeds from the Sale was not adequate protection of his interest.

### D. Lien Rights

Kurtin next challenges the Bankruptcy Court's finding that there was a *bona fide* dispute over his lien rights. *See* OB at 11.

A trustee may sell a property free and clear of "any interest in such property of an entity other than the estate" if "such interest is in bona fide dispute[.]" 11 U.S.C. § 363(f)(4).

Kurtin points out that at the time the Bankruptcy Court authorized the sale, it had ruled in the subordination litigation that his liens and claim were not "avoided"—so that, according to Kurtin, there could be no "*bona fide* dispute" about the validity of his liens and claim. *See* Order Amending Memorandum of Decision and Order at 5, Subordination Litigation, Case. Nr. SD BK 19-13858 ES [Doc. # 208]. But within the same Order that Kurtin cites, the Bankruptcy Court also made clear that it agreed with the plaintiff in the adversary proceeding (the Trustee, here) that Kurtin's liens and claim were mandatorily subordinated under 11 U.S.C. § 510(b):

> Plaintiffs are entitled to judgment as a matter of law on their claims for relief to mandatorily subordinate the Kurtin Claim and the Kurtin Liens under § 510(b). Both the Kurtin Claim and the Kurtin Liens are subordinated by this relief because the term "claim" referenced in § 510(b) includes both unsecured and secured, *i.e.*, *in rem* lien rights to payment. . . . Accordingly, pursuant to § 510(b), no payments will be made on account of the Kurtin Claim and Kurtin Liens until the claims of all other unsecured creditors have been paid in full in the Elieff, Morse and Camden cases, and after allowed interests as to Morse and Camden. Although the Court finds that the Kurtin Claim and the Kurtin Liens are subject to mandatory subordination under 510(b), the Kurtin Liens are not avoided.

*Id.* at 4 (internal quotation marks omitted).

Kurtin appealed this ruling and, at the time of the Sale Order, his appeal remained pending.[5] In that appeal, he specifically challenged the Bankruptcy Court's ruling that his claims were mandatorily subordinated under section 510(b)—a fact noted and relied upon by the Bankruptcy Court when it found that a *bona fide* dispute existed. *See* AR 30 ("The treatment of such subordinated liens is indeed the subject of a *bona fide* dispute, as best evidenced by Kurtin's pending appeal of this court's order regarding such subordination of the liens.").[6]

Contrary to Kurtin's arguments, a dispute as to the prioritization (not merely the validity) of an interest is a *bona fide* dispute for the purposes of section 363(f)(4). *See, e.g.*, *In re Daufuskie Island Props., LLC.*, 431 B.R. 626, 646 (Bankr. D.S.C. 2010) (finding issues of *bona fide* dispute including "the priority of rights among the parties"); *In re Farina*, 9 B.R. 726, 729 (Bankr. D. Me. 1981) (explaining that section 363(f)(4) concerns situations where the adjudication of the "validity, perfection, amount *and priority* of a lien will result in a delay detrimental to the best interests of the estate (emphasis added)); *In re TWL Corp.*, No. 08-42773-BTR-11, 2008 WL 5246069, at *5 (Bankr. E.D. Tex. Dec. 15, 2008) (noting that an objection to whether a claim was secured rendered the claim subject to a *bona fide* dispute); Salerno, et al., Is a Lien Priority Dispute a *Bona Fide* Dispute?, *Advanced Chapter 11 Bankr. Practice* § 7.109 (2022) ("[T]he majority [of cases] suggest that a lien priority dispute suffices."). This interpretation is also consistent with the purpose of section 363(f)(4), which seeks to prevent the delay of liquidation of the estate's assets while disputes regarding interests in the estate are litigated. *See, e.g.*, *In re Clark*, 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001). Kurtin again fails to show that the Bankruptcy Court erred in this regard.

---

[5] Since this time, and after Appellant brought this appeal, the Ninth Circuit's Bankruptcy Appellate Panel affirmed the Bankruptcy Court. *See In re Elieff*, 637 B.R. 612 (March 21, 2022)

[6] Although this citation is to the tentative order of the Bankruptcy Court, to the extent that the Sale Order does not incorporate this reasoning, this Court may affirm the Bankruptcy Court on any ground supported by the record. *In re E. Airport Dev., LLC*, 443 B.R. at 828.

### E. Good Faith Purchaser

Finally, Kurtin argues that it was error to find that the buyer—the stalking horse bidder—was a good faith purchaser under 11 U.S.C. § 363(m).

A "good faith purchaser" is one who buys "in good faith" and "for value." *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992) (internal citation and quotation marks omitted). A lack of good faith is generally shown by fraud, collusion, or an attempt to take advantage of other bidders. *Id.* A good faith finding may be relevant on appeal but such a finding is not required for a bankruptcy court to approve a sale under 363(b). *See In re Thomas*, 287 B.R. 782, 785 (9th Cir. 2002).

Under 11 U.S.C. § 363(m)—

> [t]he reversal or modification on appeal of an authorization under [§ 363(b)] of a sale or lease of property does not affect the validity of a sale . . . under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

As discussed in detail above, the Court rejects Kurtin's other arguments on appeal and Kurtin provides no authority to support that standing alone, error as to whether the purchaser lacked good faith would justify reversing the sale order. Moreover, the Bankruptcy Court did not clearly err when finding that the purchaser was a good faith purchaser following a colloquy on the record at the sale hearing. Kurtin speculates that because the purchaser's manager refused to disclose the purchaser's equity owner, the purchaser was not in good faith. OB at 16. But this speculation fails to show that the Bankruptcy Court clearly erred, where the Bankruptcy Court questioned the manager under oath, on the record, and the manager assured the Court that neither he nor the purchaser had any connection with (including being provided funding by) the Debtor. *See* AR 59–

61.[7] The Court therefore finds that the Bankruptcy Court did not clearly err when it found that the stalking horse bidder was a good faith purchaser.

### III.
### CONCLUSION

The Court **AFFIRMS** the Sale Order and **DISMISSES** the appeal.

DATED: September 26, 2022

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

cc: Bankruptcy Court

---

[7] Although neither party raises the issue of mootness, the Court has considered whether the Bankruptcy Court's valid good faith finding and Kurtin's failure to obtain a stay of the sale pending appeal renders this matter seeking invalidation of the sale order moot. *See, e.g., In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1171 (9th Cir. 1988) (explaining that an appeal is moot if a purchaser buys an asset in good faith and a stay pending appeal is not in place). Because the Trustee asserts that Kurtin has essentially obtained a *de facto* stay of the sale (as a title company generally will not close a sale if an appeal is taken) and thus it is not clear that the sale has been fully consummated, the Court has addressed the merits of Kurtin's arguments. *Cf. In re Sw. Prod., Inc.*, 144 B.R. 100, 105 (B.A.P. 9th Cir. 1992) (holding that a bankruptcy appeal was moot where following the sale order, assets had been transferred, a closing payment had been made, and possession of real property had been taken).